UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA L. DIMPFL,

               Plaintiff,               Case No. 05-72035

vs.

                                 HONORABLE AVERN COHN

JO ANNE B. BARNHART,           HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/


**REPORT AND RECOMMENDATION**

**I.**      **BACKGROUND**

      Linda Dimpfl brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) .  For the following reasons, IT IS RECOMMENDED Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the case remanded for further proceedings  to supplement the record and complete the "C" criterion of the Psychiatric Review Technique.

**A.**      **Procedural History**

      Plaintiff originally filed her application for DIB on May 1, 2003, claiming disability since April 1, 2001, due to depression (R. 46, 48, 53).  After an initial denial, Plaintiff had a  hearing on January 18, 2005, before Administrative Law Judge (ALJ) Dean C. Metry who again denied it on February 3, 2005, (R. 14-23).  The Appeals Councils declined review (R. 4-6).  Plaintiff's insured

status expired on September 30, 2002 (R. 50, 62).

**B.**   **Background Facts**

     **1.**   ***Plaintiff's Hearing Testimony***

Plaintiff was 51 years old at the time of the hearing (R. 182). She was 5 feet 6 inches tall and weighed 180 pounds. This weight represented a weight gain of 60 pounds in the last year, which she attributed largely to the side effects of her medication (R. 183).

She has two grown children ages 25 and 21. She had completed two years of college and some night school, but does not have a degree. She can read and write and do simple arithmetic. She had attempted suicide after her husband initiated divorce proceedings in the beginning of April 2001 (R. 197, 207). After her hospitalization and before she moved out on her own she had taken turns living with her sisters and mother (R. 194). She had lived on her own since August or September 2002 (R. 187). Her current state of depression was characterized by a sad mood, with a low feeling and lack of energy (R. 199). She felt as though she had gotten better in "some areas" since her suicide attempt, but worse in others (R. 202). She also felt as though she could not do things that she used to do and thought she should be able to do. She gave as examples her sister handled her finances and that she had trouble grocery shopping. She stated that her mind was in a fog and she could not focus or concentrate (R. 200). She found it hard to leave the house on occasion due to indecision and fear, but felt that she was not routinely or regularly incapacitated (R. 210). Her medication caused weight gain and hot flashes and may have caused her problems with sleep, though this could also have been caused by the depression.

She woke up each day on a varying schedule, but no later than 10:00 a.m. (R. 189). She had

trouble falling asleep at night and did not sleep well when she fell asleep (R. 189-90).  She did not usually cook and did not eat on a regular basis (R. 190).  When she woke up she usually smoked, drank coffee and, when she remembered, took her medication.  Her sister took care of all her financial matters. Her sister and mother lived nearby and also  helped her out when she could not take care of herself (R. 191).  She did her own household chores, laundry and cooking "when they get done" (R. 192).  She vacuumed less than weekly and sometimes let dishes pile up in the kitchen (R. 202).  She only watched television in the evening, not the day, and went shopping and/or grocery shopping when she could (R. 193).  She did not have friends, did not speak regularly to her son and spoke to her daughter once a week (R. 194).  She enjoyed reading and gardening, and used to do crafts  (R. 195-96).  She attended church from 0-3 times per week and tried to be involved with church activities (R. 208).  She had assisted with the planning of a "ladies' day" at her church and attended the event (R. 209).

Her last job was with a maid service which she owned from the Fall of 1994 until the "beginning of July" 2001 when she closed the business (R. 184, 186).  The business performed residential cleaning services and she did the labor herself  for the last 9 months the business was open.  After her hospitalization in April 2001 she continued to run the business, including keeping the books and performing cleaning jobs (R. 186).  Her sister assisted her by driving her to work and calling clients, but Plaintiff would get to a job and "cry the whole time" and eventually her sister could not assist her any longer due to her own obligations (R. 207).   From 1994 to the start of her cleaning business Plaintiff worked "three or four jobs" while trying to start her business.  In 1990 she worked as a office/business manager for a endodontist (R. 187).  She had applied for a position as a secretary with her church "a year or two" before she moved into her own house (R. 195).

She felt she could not return to her past work because she could not remember how to do it (R. 203).  She did not have any physical limitations that would prevent her from working, but she stated that "keeping anything on a routine basis" was beyond her psychological abilities (R. 204, 205).  She had memory problems and did not see a clear future for herself (R. 204).  When asked if she could perform a job without "much in the way of production quotas", that was not complicated or physically demanding and involved no interaction with customers and very little interaction with co-workers,  she indicted that she had thought of this option, but did not think she could be reliable (R. 207-08).

2.    ***Relevant Medical Evidence***

***a.) Evidence prior to Date Last Insured--September 30, 2002***

On April 14, 2001, Plaintiff was seen by A.  King Ang, M.D., for right groin pain and a small lesion of her left groin (R. 129).  Dr. Ang was not able to pinpoint the problem and Plaintiff agreed that Dr.  Ang would watch symptoms until they were no longer tolerable.

On April 20, 2001, Plaintiff was admitted to the emergency room with a diagnosis of "acute drug overdose with benadryl ... depression [and] suicide attempt (R. 120).  Plaintiff's husband had called 911 after finding a suicide note and Plaintiff in bed with "multiple areas of emesis scattered about the bed".  (Id.)  Plaintiff was brought to the emergency room "combative and uncooperative insisting she was going to leave".  (Id.)  Plaintiff had no history of depression or contributory illness and explained that she had attempted suicide and was very unhappy about her impending divorce. She was described as awake, alert, agitated, moderately  uncooperative with somewhat disjointed thoughts (R.  121).  Her drug screen was positive for tricyclics and opiates, but the rest of the physical exam was normal.  A chest x-ray revealed a stable unchanged chest (R.  118).

4

Plaintiff was admitted to North Oakland Medical Centers on April 21, 2001, with a diagnosis of major depressive disorder, single episode, severe without psychosis; dependant personality disorder and osteoporosis (R. 125). Plaintiff explained that her husband had asked for a divorce two weeks earlier and that she had been trying to convince him to change his mind. The couple had separated before and had discussed divorce, but when she was served with divorce papers on April 19 she was convinced that "her husband intended to follow through." Plaintiff was described as well-developed, well-nourished, well-kempt and appropriately attired (R. 125-126). She had normal psychomotor activity, a moderate to severely depressed mood, normal speech and no delusions or perceptual abnormalities (R. 126). She participated in individual and group psychotherapy and drug lectures and received antidepressant medication. When she was discharged on April 26, 2001, her depression was "significantly improved" and she seemed to "have accepted the need for the divorce, and [was] making plans for living alone." She had no side effects from her medication, Prozac. Upon discharge Plaintiff was given no diet restrictions, was instructed to do activities as tolerated and follow up with her internist and psychotherapist.

At a May 17, 2001, follow-up visit, Dr. Ang noted that Plaintiff was depressed due to marital issues, still smoking a pack of cigarettes a day and weighed 140 pounds (R. 137).

On June 4, 2001, Dr. Ang reported that Plaintiff was seeing a therapist once a week, still very depressed, had no suicidal ideations, complained of insomnia and weighed 134 pounds. He characterized her improvement with depression as "slow" and recommended that she continue weekly therapy and increased her Prozac dosage (R. 138).

On June 10, 2001, Plaintiff reported to Dr. Ang that she was still attending therapy once per week with Dave Thomas, but did not feel she was making much progress. Dr. Ang continued

Plaintiff on Prozac, added Pamelor and recommended that she continue weekly therapy and return in 4 weeks.  Plaintiff's weight was recorded at 132 pounds.

On her next follow up with Dr. Ang (date illegible) Plaintiff stated that she felt "better of late" but complained of weight gain she attributed to Prozac (R. 139).  Plaintiff had gained 11 pounds since February 2001 and Dr. Ang switched her from Prozac to Wellbutrin.

On December 11, 2001, A. K. Jain, M.D., wrote a "to whom it may concern" letter in which he indicated that he had been treating Plaintiff since October 9, 2001, and he felt she was "incapable of holding any job and is considered disabled" (R. 151).  He further stated that her progress since the suicide attempt had been "meager and slow" and she still showed significant signs of "crying, lack of concentration, lack of attention, motivation, rumination guilt, anger, feelings of worthlessness, loss of pleasure, feelings of hopelessness, agitation, fluctuation in sleep/appetite and severe apprehension about her future."  Her prognosis was guarded and dependant upon response to treatment.

On December 26, 2001, E. Wayne Byrum, MSW, CBT, wrote a letter addressed to "Mr. Callahan" in which he stated that he had been seeing Plaintiff since August 2, 2001, due to a major depression disorder brought on by her impending divorce (R. 152).  Mr. Byrum explained that Plaintiff was taking anti-depressant medication and receiving psychotherapy and had been living with family members since she was released from the hospital following her suicide attempt. Plaintiff continued to have feelings of hopelessness, low self-esteem, rejection, despair, desire to withdraw and isolate, grieving, lack of energy, difficulty problem solving, loneliness and fatigue.  She cried easily and had feelings of failure and that her life was out of control, and she was having trouble with concentration and sleep.  He opined that Plaintiff was unable to work due to major

6

depression and needed to continue psychotherapy 2-3 times per month indefinitely.

### b.) Evidence after Date Last Insured--September 30, 2002

On July 28, 2003, R. Hasan, M.D., examined and evaluated Plaintiff for the State of Michigan Disability Determination Service (DDS) (R. 153). Plaintiff stated that she had been depressed on and off for the last 2 years and that her problems started 3-4 years ago when her husband asked for a divorce. She felt helpless and hopeless, had no motivation, 2 psychiatric hospitalization, and had been treated with Wellbutrin with some improvement. She was treating with Dr. Youseff, a psychiatrist. She was calm for the interview and reported that she lived alone, got along "average" with her family, had no friends and no contact with her neighbors. She did not have any hobbies but attended church regularly. In her free time she watched television, did light household chores and was able to cook light meals and take care of her basic needs. She weighed 175 pounds. She had normal posture, slow gait with fair hygiene and grooming, and reported occasional problems with short-term memory. A mental status exam reveled that she was in touch with reality, had low self-esteem and normal psychomotor activity, with some motivation and insight. Her speech was spontaneous and logical. She had no hallucinations, delusions, persecutions, obsessions or suicidal thoughts or homicidal ideations (R. 154). She had mood swings, felt depressed and helpless and complained of a fluctuating sleep pattern. Her affect was appropriate and her mood calm. She also complained of anxiety attacks occurring 2-3 times per week for "no reason." Dr. Hasan diagnosed major depression, anxiety disorder with panic attacks and a GAF of 55 (R. 155).[1]

_____

[1]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at

On August 25, 2003, Mr. Byrum completed a Psychiatric/Psychological Examination Report in which he indicated that Plaintiff was unable to function independently on a sustained basis because of memory problems (R. 157). He noted that she was able to attend church and function in a few activities. He diagnosed Plaintiff with major depressive disorder and a GAF of 45, up from 35 the previous year, and indicated that he would be treating her twice per month. On the Mental Residual Functional Capacity Assessment, Mr. Byrum indicated that Plaintiff was "moderately limited" in her ability to: remember locations and work procedures, sustain an ordinary routine without supervision, respond appropriately to change in the workplace and travel to unfamiliar places or use public transportation (R. 158-59). She was "markedly limited" in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, work in coordination or proximity to others, make simple work-related decisions, complete a normal workday without interruptions form psychologically based symptoms and perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism and set realistic goals or make independent plans. She was not significantly limited in her ability to: understand and remember 1-2 step instructions, carry out simple 1-2 step instructions, get along with peers and co-workers without distracting them or

_____

30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

exhibiting behavioral extremes, maintain socially appropriate behavior or be aware of and take precautions for normal hazards.

On September 8, 2003, Donald Tate, Ph.D, a licensed psychologist, completed the Mental Residual Functional Capacity Assessment and found Plaintiff to be moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods; set realistic goals or make plans independently and the ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but not significantly limited in any other area (R. 100-101). He opined that Plaintiff had major depression and an anxiety disorder without attacks and was capable of doing simple, unskilled work (R. 103). Dr. Tate also completed the Psychiatric Review Technique Form and indicated that Plaintiff had medically determinable impairments of major depression and anxiety disorder (R. 104). Under the "'B' Criteria of the Listings" Dr. Tate indicated that Plaintiff had mild limitations in completing everyday activities and maintaining social function and moderate limitations in maintaining concentration, persistence or pace, and had 1-2 episodes of decompensation (R. 114). Dr. Tate did not complete the section regarding the "C criteria of the Listings" (R. 115).

On March 8, 2004, Robert E. Erard, Ph.D., submitted a report as an independent expert in Plaintiff's divorce proceedings in the Oakland County Circuit Court (R. 160). Plaintiff reported that she had been psychiatrically disabled from work since her suicide attempt and was currently in psychiatric treatment (R. 162). She lived by herself but she, and her family, reported that she required considerable assistance from her family to manage her affairs. She reported an impaired ability to care for her personal hygiene, shop for clothing and food, manage finances and drive. Dr.

Erard  reported that Plaintiff was brought to "all appointments" by a family member, was casually dressed and appropriately groomed  (R. 163).  She showed signs of mild anxiety and moderate psychomotor retardation.  Her speech was sometimes halting.  She had a logical stream of thought but had difficulty finding the word she wanted to use and lost track of her "train of thought" from "time to time."  Her affects were spontaneous and generally consistent with mental content, her mood was depressed and hopeless.  Her memory and concentration were seriously impaired.  There were no indications of hallucinations, delusions, obsessions or other abnormal mental content and no suicidal ideation.  She explained that her marriage had always been rocky, she had filed for divorce herself 10 years prior and they had gone to marriage counseling in the past without much success (R. 165).  She had experienced repeated episodes of persistent depressed mood, diminished energy level, loss of appetite, sleep disturbance and suicidal ideation along with weight change, bowel problems, difficulty concentrating, loss of interest in sex, social withdrawal, agitation and irritability (R. 166).  She had multiple anxiety attacks and an unreasonable fear of confined spaces, medical situations and certain social situations.  She had unwanted repetitive thoughts and sleep problems including trouble falling asleep, waking up too early and sleeping during the day.  She was only able to "'behave normally'" for brief periods of time and then  started  crying out of control (R. 167).  Family members took her shopping and drove her places of any distance.  Her sister handled her fiances because she was unable to keep track of bills.  She had applied for a job as a secretary at her church, and felt that she had improved but was still unable to function.

        Dr. Erard administered several tests to Plaintiff:

        (1.)    Wechsler Adult Intelligence Scale (WAIS-III) – on which she scored in the average range for Verbal IQ, low average range for Performance and average range for Full Scale.  The

subset scores revealed what Dr. Erard estimated was a 10-15 point drop in intellectual functioning, but he pointed out that her "cognitive capacities have been sufficiently preserved to allow [her], *on the whole*, to demonstrate problem-solving ability similar to that seen in the average working adult" (R. 169) (emphasis in original).

(2.)    Structured Interview of Reported Symptoms (SIRS) – this test is designed to detect malingering and factitious or exaggerated self-presentation of symptoms. Plaintiff had a moderately elevated score on the Subtle Symptoms scale, which  measures the "frequency with which the subject endorses a high variety of everyday problems or symptoms that are not always associated with mental illness." Yet, because the remainder of the SIRS scales were unremarkable Dr. Erard interpreted the elevation as either an indicator of unreliable reporting or the presence of an usual range of difficulties involving a factor other than mental illness. He determined that the SIRS result did not provide substantial support for a finding that Plaintiff was feigning or exaggerating her symptoms.

(3.)    Minnesota Multiphasic Personality Inventory (MMPI-2)/Rorschach Inkblot Method (RIM)  – The MMPI-2 results showed "statistical evidence of an unusually inconsistent approach to answering test question" such as 14 examples of inconsistent responding to semantically identical or opposite test items as measured by the Variable Response Inconsistency scale (VRIN) (R. 170). Yet, Dr. Erard opined that the overall test evidence did not support a conclusion that she generally answered questions randomly or without due consideration, and the elevated VRIN score suggested mental confusion or indecision. This problem left the MMPI-2 results amenable only to "cautious interpretation (R. 171). The validity scores showed that she had answered the questions candidly with no apparent effort to "exaggerate her symptoms or make herself look more psychiatrically ill

11

or disabled than she actually is."  Her overall profile was indicative of "serious and pervasive

psychiatric disturbance" and she showed marked elevations on Low Positive Emotions,

Demoralization and Somatic Complaints; and clinical  elevations on Anxiety, Depression and

Health Concerns.  Her scores on positive indicators for treatment and work recovery were "not

encouraging."  Dr. Erard remarked that patients with similar profiles usually suffer form a wide

range of painful and moderately debilitating physical complaints, and that cognitive complaints such

as difficulty concentrating and mental dullness were likely to be present.  He further stated:

> These individuals feel anxious and on edge most of the time, to the point where that
> are almost chronically wary or jumpy.  Most of the time, they feel intensely unhappy,
> plagued by worry, and full of feelings of guilt, worthlessness, helplessness, and self
> doubt.  They feel overwhelmed by even minor stresses, particularly if these involve
> anger or conflict. ... They find it difficult to manage many simple, everyday tasks and
> feel paralyzed in the face of major decisions or undertakings.
> .... Extremely sensitive to rejection, they are in perpetual struggle with unresolved
> or blocked grief and sadness. ...
> Such problems are commonly associated with long-term functioning at significantly
> lowered levels of efficiency, if not outright disability. ... The prognosis for markedly
> improved mental health or successful return to stable employment is guarded.

(R. 171-72).

Plaintiff did  not answer enough of the RIM questions to provide a reliable and stable

scoring, making the test results useable only through content and sequence analysis and behavioral

observation (R. 172).  Nonetheless Dr. Erard felt that "several findings seem significant."  He opined

that Plaintiff had difficulty actively structuring and making sense of her environment and saw herself

as "nobody, a nothing."  There was also evidence of mental confusion, word finding difficulty,

somatization  under stress and a chronic sense of helplessness, frustration and resentment.

(3.)    Neurological exam - completed by Dr.  Bruce Silverman, D.O. - the results of this

exam were nonfocal, and Dr.  Silverman felt it was necessary to rule out a primary central nervous

system cause for Plaintiff's complaints through further testing (R. 172-73). The testing was not completed because Dr. Silverman felt it was out of the limits for a referral to do an independent medical exam. Dr. Silverman concurred that hypoxia or anoxia from Plaintiff's overdose could have affected her brain (R. 173).

Dr. Erard also reviewed Plaintiff's medical records and interviewed her husband. He concluded that the evidence did not support malingering or exaggerating. Plaintiff's difficulties with memory, concentration and word finding, dependance on family for her finances and some driving, application for church secretary job, treator's findings of disability and obvious shame and discomfort with her condition all "militate against a finding of feigned disability." Dr. Erard felt her inconsistent self-presentation on the SIRS and MMPI-2 and her "somewhat unusual number of personal difficulties even for someone with serious clinical depression" were reflective of persistent cognitive difficulties and may reflect neurological problems, rather than motivational distortion. They was ample evidence to support a finding that Plaintiff suffered from "chronic, severe and disabling Major Depressive Disorder which substantially interferes with her cognitive efficiency, emotional stability, interpersonal effectiveness and multiple activities of daily living, including her ability to maintain sustained gainful employment." She had a "bona fide long-term psychiatric disability and [ ] her prognosis for improvement is guarded" (R. 174). Dr. Erard recommended that Plaintiff receive the neurological tests recommended by Dr. Silverman; return to regular psychotherapy at a higher level than in the past, including partial hospitalization for several weeks followed by outpatient therapy 2-3 times per week; use of an antidepressant and, if none of this worked, consideration of alternative treatments including ECT and vagus nerve stimulation (R. 174-75).

13

On January 13, 2005, Violet B. Heise, Ph.D, a licenced psychologist, wrote a letter indicating that she had been treating Plaintiff on a weekly basis since November 24, 2003 (R. 176). She diagnosed Plaintiff with major depressive disorder, recurrent, of moderate severity. Plaintiff had sad mood, periods of tearfulness, lack of self-confidence, anxiety and fear regarding inability to complete tasks, feelings of pessimism and hopelessness about the future, difficulty sustaining attention and focus on complex thoughts, difficulty moving from intent or desire to complex task completion and a low level of energy. She also experienced weight gain and some sleep disturbance. She was completing basic daily tasks such as personal hygiene and grooming, some food shopping and meal preparation for herself; drove short, familiar routes; contributed to the basic order of her home; watched television; attended church and church related activities; and interacted with her family. She had planned a church group activity with support of others. She appeared to have made some progress over the last year but remained unable to perform full-time employment.

### 3.    *Vocational Evidence*

ALJ Metry asked Vocational Expert (VE) Elizabeth Pasakowski, to consider whether there were jobs one could perform assuming a hypothetical person of Plaintiff's age and education with no physical limitations and the following non-exertional limitations: only incidental contact with the general public and co-workers (which was defined as no regular face-to face services for customers or working on teams or in tandem with co-workers), only simple one to two step tasks and task orientated and not production or quota driven (defined as no production or quota schedule) (R. 213-14). VE Pasakowski responded that following sedentary and light and medium exertional jobs were available in the regional economy in the indicated quantities: 3,200 sedentary and 6,300

14

light bench assembly positions; 1,500 sedentary and 5,100 light sorter positions; and 1,100 sedentary and 2,400 light packing positions (R. 213).

ALJ Metry then asked VE Pasakowski why the hypothetical person could not work if one assumed that the person was impaired just as Plaintiff described herself in the hearing testimony (R. 215). VE Pasakowski stated that the inability to follow through with tasks, and complete the most basic activities of daily living (such as taking care of bills), in addition to the alleged memory, concentration and reliability issues would be preclusive of the jobs to which she had testified (R. 215, 217).

### 4.    *The ALJ's Decision*

Plaintiff met the non-disability requirements and was insured for benefits through September 30, 2002 (R. 22). ALJ Metry found Plaintiff's depression was severe as defined in 20 C.F.R. § 404.1521, but did not meet or medically equal the criteria of any impairment set forth in the Medical Listings; Appendix 1, Subpart P, Part 404 of Regulations (20 C.F.R. § 404.1520(d)) (the "Listing") prior to the expiration of her insured status.

Plaintiff's allegations regarding her limitations were not fully credible because: she had no further hospitalizations or emergency room treatment after her suicide attempt; she had lived on her own since August 2002 "indicating a greater degree of independence than she admits"; her outpatient treatment was not well-documented and her treators relied on her description of symptoms and limitations; and there was evidence in the record that her divorce was not unexpected, as she had alleged (R. 17, 22).

ALJ Metry relied on the opinion of Dr. Tate, the state agency consultant, and stated that he rejected the opinions of Plaintiff's treators (R. 17). Psychologist Violet Heise's January 13, 2005,

15

opinion was given limited value because she submitted no records to indicate that she had treated Plaintiff during her insured status and her conclusion that Plaintiff could perform no full-time employment was a issue reserved to the Commissioner (R. 20). He did rely on Dr. Heise's opinion to the extent it indicated that Plaintiff could "perform simple one to two step tasks and interact appropriately with co-workers, supervisors and the general public on a sustained basis."

Robert Erard, Ph.D's opinion was given "no significant weight" because he was a non-treating examining psychologist, and his opinion that Plaintiff was disabled was an issue reserved to the Commissioner (R. 19). Dr. Erard relied almost exclusively on Plaintiff's "subjective complaints, her presentation and behavior during testing and her interview, and the conclusory statements of disability from her physicians." Dr. Erard "considered her responses on the MMPI-2 unreliable but did not acknowledge that [she] had an underlying reason to respond unreliably, namely obtaining ongoing spousal benefits in her divorce action." [It is likely this court appointed psychologist was fully aware of the legal context and consequences of his evaluation for the court.]

Social worker Wayne Byrum, opinion was given no weight because he did not submit "counseling records to demonstrate clinical findings or observations that would substantiate the severity and extent of [Plaintiff's] functional limitations or the length, nature, and frequency of her treatment" and his conclusion that Plaintiff could not work "reaches the ultimate determination of disability reserved to the Commissioner."

A.K. Jain, M.D.'s letter dated December 11, 2001, in which he opined that Plaintiff was "'incapable of holding any job and is considered disabled'" was given no weight because Dr. Jain had a "short-term treating relationship with the claimant and his opinion that she was 'disabled'" was an issue reserved to the Commissioner.

ALJ Metry concluded that prior to her September 30, 2002, date last insured Plaintiff had no physical limitations but was limited to simple one to two step tasks with routine pace, only incidental contact with the general public and no work in close contact with co-workers and supervisors (R. 22).

Plaintiff was unable to perform her past relevant work and was limited to unskilled work and thus had no transferable skills to other work. Using the Medical-Vocational Guidelines as a framework ALJ Metry determined that Plaintiff had the RFC to perform a significant range of work at all exertional levels, referring to the sedentary, light and medium exertional level jobs identified by VE Pasakowski, and Plaintiff was, therefore, not disabled (R. 22-23).

II. **ANALYSIS**

    A. <u>**Standards Of Review**</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, physical examination 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

In a case such as this, evidence subsequent to onset date of disability and even after the insured status has expired can be probative. *Ellis v. Schweiker,* 739 F.2d 245, 247-49 (6th Cir. 1984).

### B.  Factual Analysis

Plaintiff challenges the Commissioner's decision alleging that ALJ Metry's opinion that Plaintiff did not meet the Listing for Affective Disorders §12.04 was not supported by substantial evidence because (a.)  Dr. Tate's opinion, as non-examining consulting physician, was insufficient for support, and (b.) the record supports a conclusion that Plaintiff's disability arose prior to the expiration of her insured status.

It is undisputed that Plaintiff has mental limitations.  ALJ Metry found Plaintiff's depression to be a severe metal impairment (R. 22).  At Step Three in the five-step sequential evaluation process used to decide whether a claimant is disabled, the ALJ must "consider the medical severity of [the claimant's] impairment."  20 C.F.R. §404.1520 (a)(4)(iii.).  If the claimant does "not have a severe

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

medically determinable physical or mental impairment that meets or equals one of [the] listings in appendix 1 ... and meets the duration requirement" in §404.1509 they not disabled.  *Id.*

In forming his opinion that Plaintiff's impairment did not meet or equal the listings ALJ Metry relied upon the opinion of Dr. Tate, and rejected Plaintiff's medical sources and discounted her testimony for the reasons stated above.  Plaintiff argues that Dr. Tate's opinion, as a non-examining, consulting physician was insufficient to support ALJ Metry's decision and challenges his rejection of her treating sources.

### A.    Rejection of Plaintiff's Medical Sources

Plaintiff's argument is not specific as to how the criteria set forth in Listing 12.04 were met by her medical sources.  Instead, her argument centers on the allegedly improper rejection of her medical sources' opinions that she is disabled.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits.  20 C.F.R. § 404.1527.  While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are stricter than those established by the Sixth Circuit.  The new regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.  Indeed, the Commissioner's use of the "treating source" as opposed to "treating physician" appears to be an effort to distinguish these new regulations from the case law established in the various circuits under the generic term of the "treating physician rule."

Under the regulations, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d).  In those situations where the Commissioner does not give the treating source opinion "controlling weight," the regulations set out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.[3]  The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 1527(d)(2).

Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary."  These include:

1.  An opinion that claimant is disabled under the "statutory definition of disability."
2.  An opinion on the nature and severity of the impairment if that opinion does not meet the "well supported" standard of § 1527(d) set out above.
3.  An opinion that the claimant meets the Listing of Impairments.
4.  An opinion on the effects of an impairment on the claimant's residual functional or vocational capacity.

Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing or on residual functional capacity.

While 20 C.F.R. § 404.1527(a) define s medical opinions to include statements from

---

[3]Those five criteria are:
(1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
(2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
(3) the consistency of the opinion with the record as a whole;
(4) specialty, with greater weight given to relevant specialists;
(5) and other factors which tend to support or contradict the opinion.

physicians as to what an individual "can still do despite impairment(s), and [a claimant's] physical or mental restrictions," these factors are different than the issues reserved to the Commissioner, including the individual's residual functional capacity and whether the person can perform other work in the economy and is thus not disabled.  See SSR 96-5p and 20 C.F.R.§§ 404.1527(e) and 429.927(e).

SSR 96-5p notes this difference with regard to residual functional capacity determinations which include the individual's ability to perform work-related activities based on both medical and non-medical evidence.  It points out that the ALJ often has substantial additional evidence available in making this determination than does a treating source.  While the ALJ must consider the opinion of claimant's treating source as to what the claimant can still do, the judgment as to whether claimant has the residual functional capacity for other work involves considerations beyond that medical judgment as to what the individual can still do and is a determination to be made by the ALJ. Furthermore, the ALJ in making that determination is only bound by the treating source's opinion on what the individual can do when that opinion meets the standards set out in 20 C.F.R. § 404.1527(d)(2).  As noted above, that regulation and SSR 96-2p give controlling weight to a treating source opinion only when that opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent" with other substantial evidence in the record.

Here ALJ Metry discounted the opinions of treaters Drs. Heise and Mr. Byrum for lack of supporting records documenting their clinical conclusions and Dr Jain for having a limited treating relationship with Plaintiff.  Only Dr. Jain and Mr. Byrum treated Plaintiff prior to her insured status ending September 30, 2002.  There is no evidence of an opinion from the fourth therapist who had treated Plaintiff prior to September 30, 2002.  Dr. Heise did not begin treating Plaintiff until

November 24, 2003 (R. 176).  Other opinions – particularly the more detailed report of Dr. Erard –

were expressed by non-treating sources and most of the opinions were on the subject of disability

reserved to the Commissioner.

Based on the current record, ALJ Metry gave minimally adequate reasons for rejecting the

opinions of Drs. Heise, Erard and Jain and Mr. Byrum[4] to the extent they concluded that Plaintiff was

disabled.  Further, Plaintiff failed to submit any treatment notes or records from Drs. Heise and Jain

and Mr. Byrum.  SSR 96-5p and 20 C.F.R. § 404.1512(e) suggest occasions for  recontacting a

treating source for additional data.[5]  While this might have been appropriate in this case for the

treating therapists, this is not an issue raised by Plaintiff's counsel.   Claimant bears the burden of

proving that she is disabled.  *See  Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995).  She must

present "complete and detailed objective medical reports of her condition from licensed medical

professionals." *See id.* (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).[6]  Without their treatment

notes and/or medical records, the letters from Drs. Heise and Jain and Mr. Byrum are conclusory

statements from medical sources that are unsupported by medically acceptable data.  As such, even

the treating sources, Drs. Heise and Jain, need not be given controlling weight.  *Stormo v. Barnhart*

---

[4] Defendant correctly points out that Mr. Byrum is not a "treating source" as defined by the regulations because  he has an M.S.W. and is not a licensed physician or psychologist.  20 C.F.R. § 404.1513(a).  ALJ Metry treated his opinion as an "'other source' whose statements can be used to consider the severity and extent of the claimant's functional limitations (20 C.F.R. 404.1513(d)(1))" (R. 18).  Mr. Byrum's opinions would not be entitled to controlling weight.

[5] An ALJ needs to  recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir 2002).

[6] Plaintiff also apparently neglected to submit any records or opinions from two medical sources, Mr. Dave Thomas (referred to at R. 50, 138) and Dr. Youseff (referred to at R. 55, 162 and 176).

, 377 F.3d 801, 805-806 (8th Cir. 2004) (citing *Piepgras v. Chater,* 76 F.3d 233, 236 (8th Cir. 1996)

(opinions are given less weight if the conclusions consist of vague, conclusory statements unsupported

by medically acceptable data.); *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir. 2002) ("treating

physicians' opinions are not medical opinions that should be credited when they simply state that a

claimant can not be gainfully employed, because they are merely 'opinions on the application of the

statute, a task assigned solely to the discretion of the [Commissioner].'"); *Kirkland v. Weinberger*,

480 F.2d 46, 49 (5th Cir. 1973) ("no clinical findings or medical data support the summary report and

its persuasive value is therefore greatly diminished").

ALJ Metry further rejected Dr. Erard's opinion because he relied on Plaintiff's subjective

complaints and her behavior during  testing.  Plaintiff argues that Dr. Erard's opinion was based on

the battery of tests he performed.  Yet in his opinion Dr. Erard explains that the neurological exam

was inconclusive and the MMPI-2, RIM and SIRS[7] test results were not entirely reliable due to

Plaintiff's alleged inability to answer fully.  This left Dr. Erard to evaluate Plaintiff based on the

questions she did answer and his observations of her efforts.  ALJ Metry was correct when he stated

that Dr. Erard had to rely on Plaintiff's subjective complaints and her presentation during the testing

and interview.   While most psychiatric evaluation is dependent on the subject's responses, it

nonetheless is data that is less reliable than other more objective testing.  An ALJ may reject even a

treating physician's opinion if it is based solely on a claimant's statements to the doctor, *Johnson v.

Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).  Dr. Erard was a consultative source in Plaintiff's divorce,

had no continuing relation to Plaintiff, and his option could be given less deference than a treating

---

[7]To the extent Plaintiff's score on the SIRS test is reliable, it indicated a low average to
average range of intellectual functioning.  The RFC ALJ Metry assigned to Plaintiff does not
contradict such a finding.

source. *Cf. Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (stating that the opinion of a consultative physician does not generally satisfy the substantial evidence requirement).

Therefore, ALJ Metry's reasons for rejecting or giving less weight to Plaintiff's medical sources was supported by substantial evidence.

### B.   Reliance on DDS Physician, Dr. Tate

Plaintiff argues that the DDS physician's report in this matter should be discounted because based on a partial record and given by a non-examining doctor. Yet, SSR- 96-6p directs that an ALJ *must* consider and address the decision of state agency consultants in their opinions as medical opinions from non-examining sources, and should obtain an updated medical opinion from a medical expert to supplement a state agency medical consultant *when the ALJ believes* that a finding of medical equivalence is required (SSR 96-6p, p. 3-4). It also requires an updated medical opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical .... consultant's finding that the impairments is not equivalent in severity to any impairment in the Listing of Impairments." Further, non-examining medical advisor's opinion can be substantial evidence. *See, e.g., Richardson v. Perales*, 402 U.S. 389, 408 (1971).

Here, Dr. Tate's September 8, 2003, opinion was submitted before the opinions of Drs. Erard and Heise. Because Plaintiff's insured status expired on September 30, 2002, (R. 50, 62), he had the records available up to that date. Yet, ALJ Metry felt that Dr. Tate's opinion still "remained appropriate" and was consistent with Dr. Hasam's opinion (R. 17). Because Dr. Heise did not submit any medical records and further because she opined that Plaintiff had difficulty concentrating on *complex* thoughts and completing *complex* tasks, it cannot be said that ALJ Metry lacked substantial

24

evidence on which to base his decision that Dr. Tate's opinion was still valid where he opined that Plaintiff was moderately limited in these same areas identified by Dr. Heise, but able to carry out simple instructions and tasks (R. 100).[8]  Yet, because a remand is needed for  Dr. Tate  or someone to complete the "C" Criterion of the psychiatric review, the fact finding function would be enhanced if that person have available the more fuller psychiatric record both before and after September 30, 2002.

After Dr. Tate made the determination that Plaintiff had severe impairments under §12.04 Affective Disorder and §12.06 Anxiety-Related Disorder (R. 100), but determining that she did not meet the Listing requirements for "B" Criteria (R. 114),  Dr. Tate should have made a finding under the "C" criteria of the Listing where the "B" Criteria is not met and a §12.04 Affective Disorder such as Major Depression is involved (R. 115).  He did not do so.  Without this, ALJ Metry cannot use Dr. Tate's conclusion to determine that Plaintiff did not meet or equal a Listing for §12.04 Affective Disorder.

If Plaintiff were found to meet  the "C" criteria she would meet or equal the Listing for § 12.04 Affective Disorder.[9]  To meet the "C" criteria one must have:

> medically documented history of affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

---

[8]Mr. Byrum also felt that Plaintiff was able to understand and complete simple 1 to 2 step instructions (R. 158).

[9]"We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A).

....

3.    current history of 1 or more years' inability to function outside a highly
supportive living arrangement with an indication of continued need for such
an arrangement.

(R. 115); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04.

With Dr. Tate's failure to assess Plaintiff under the "C" Criteria, this leaves ALJ Metry's

opinion that Plaintiff did not meet or equal the Listing, which relied almost entirely on Dr. Tate's

findings, unsupported by substantial evidence.  At the very least ALJ Metry was required to make a

finding under the "C" Criteria,[10] which he did not do, deferring instead to Dr. Tate's opinion.

Therefore, this matter should be remanded so that an ALJ can make a finding regarding whether the

evidence of record supports the presence of the "C" criteria.

## III.    RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary

Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the

case remanded for further proceedings consistent with this Report and Recommendation.  The parties

to this action may object to and seek review of this Report and Recommendation, but are required to

---

[10]"There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04,
and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the
paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B
criteria are not satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A). The  September 2000
amendments to the regulations  modified  20 C.F.R. § 404.1520a(e)(2) and § 416.920a(e)(2) to
no longer requires the ALJ to complete and attach a PRTF,  but rather the ALJ in the decision:
must incorporate the pertinent findings and conclusions based on the technique.
The decision must show the significant history, including examination and
laboratory findings, and the functional limitations that were considered in
reaching a conclusion about the severity of the mental impairment(s). The
decision must include a specific finding as to the degree of limitation in each of
the functional areas described in paragraph (c) of this section.

26

file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §

636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human

Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing

of objections which raise some issues but fail to raise others with specificity, will not preserve all the

objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and

Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829

F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is

to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than twenty (20) pages in length unless by

motion and order such page limit is extended by the Court.  The response shall address specifically,

and in the same order raised, each issue contained within the objections.


Dated: March 31, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                                United States Magistrate Judge

<u>Certificate of Service</u>

 I hereby certify that a copy of this Report and Recommendation was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on March 31, 2006.

<u>s/William J. Barkholz </u>

Courtroom Deputy Clerk
